(Slip Opinion) OCTOBER TERM, 2021 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## CARSON, AS PARENT AND NEXT FRIEND OF O. C., ET AL. *v.* MAKIN

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

No. 20–1088.   Argued December 8, 2021—Decided June 21, 2022

Maine has enacted a program of tuition assistance for parents who live in school districts that neither operate a secondary school of their own nor contract with a particular school in another district. Under that program, parents designate the secondary school they would like their child to attend, and the school district transmits payments to that school to help defray the costs of tuition. Participating private schools must meet certain requirements to be eligible to receive tuition payments, including either accreditation from the New England Association of Schools and Colleges (NEASC) or approval from the Maine Department of Education. But they may otherwise differ from Maine public schools in various ways. Since 1981, however, Maine has limited tuition assistance payments to "nonsectarian" schools.

Petitioners sought tuition assistance to send their children to Bangor Christian Schools (BCS) and Temple Academy. Although both BCS and Temple Academy are accredited by NEASC, the schools do not qualify as "nonsectarian" and are thus ineligible to receive tuition payments under Maine's tuition assistance program. Petitioners sued the commissioner of the Maine Department of Education, alleging that the "nonsectarian" requirement violated the Free Exercise Clause and the Establishment Clause of the First Amendment, as well as the Equal Protection Clause of the Fourteenth Amendment. The District Court rejected petitioners' constitutional claims and granted judgment to the commissioner. The First Circuit affirmed.

*Held*: Maine's "nonsectarian" requirement for otherwise generally available tuition assistance payments violates the Free Exercise Clause. Pp. 6–18.

(a) The Free Exercise Clause of the First Amendment protects

against "indirect coercion or penalties on the free exercise of religion, not just outright prohibitions." *Lyng* v. *Northwest Indian Cemetery Protective Assn.*, 485 U. S. 439, 450. The Court recently applied this principle in the context of two state efforts to withhold otherwise available public benefits from religious organizations. In *Trinity Lutheran Church of Columbia, Inc.* v. *Comer*, 582 U. S. ___, the Court considered a Missouri program that offered grants to qualifying nonprofit organizations that installed cushioning playground surfaces, but denied such grants to any applicant that was owned or controlled by a church, sect, or other religious entity. The Court held that the Free Exercise Clause did not permit Missouri to "expressly discriminate[ ] against otherwise eligible recipients by disqualifying them from a public benefit solely because of their religious character." 582 U. S., at ___–___. And in *Espinoza* v. *Montana Department of Revenue*, 591 U. S. ___, the Court held that a provision of the Montana Constitution barring government aid to any school "controlled in whole or in part by any church, sect, or denomination" violated the Free Exercise Clause by prohibiting families from using otherwise available scholarship funds at religious schools. 591 U. S., at ___. "A State need not subsidize private education," the Court concluded, "[b]ut once a State decides to do so, it cannot disqualify some private schools solely because they are religious." *Id.,* at ___. Pp. 6–8.

  (b) The principles applied in *Trinity Lutheran* and *Espinoza* suffice to resolve this case. Maine offers its citizens a benefit: tuition assistance payments for any family whose school district does not provide a public secondary school. Just like the wide range of nonprofit organizations eligible to receive playground resurfacing grants in *Trinity Lutheran*, a wide range of private schools are eligible to receive Maine tuition assistance payments here. And like the daycare center in *Trinity Lutheran*, the religious schools in this case are disqualified from this generally available benefit "solely because of their religious character." 582 U. S., at ___. Likewise, in *Espinoza*, as here, the Court considered a state benefit program that provided public funds to support tuition payments at private schools and specifically carved out private religious schools from those eligible to receive such funds. Both that program and this one disqualify certain private schools from public funding "solely because they are religious." 591 U. S., at ___. A law that operates in that manner must be subjected to "the strictest scrutiny." *Id.*, at ___–___.

  Maine's program cannot survive strict scrutiny. A neutral benefit program in which public funds flow to religious organizations through the independent choices of private benefit recipients does not offend the Establishment Clause. See *Zelman* v. *Simmons-Harris*, 536 U. S. 639, 652–653. Maine's decision to continue excluding religious schools

from its tuition assistance program after *Zelman* thus promotes stricter separation of church and state than the Federal Constitution requires. But a State's antiestablishment interest does not justify enactments that exclude some members of the community from an otherwise generally available public benefit because of their religious exercise. Pp. 9–11.

(c) The First Circuit's attempts to recharacterize the nature of Maine's tuition assistance program do not suffice to distinguish this case from *Trinity Lutheran* or *Espinoza.* Pp. 11–18.

(1) The First Circuit held that the "nonsectarian" requirement was constitutional because the benefit was properly viewed not as tuition payments to be used at approved private schools but instead as funding for the "rough equivalent of the public school education that Maine may permissibly require to be secular." 979 F. 3d 21, 44. But the statute does not say anything like that. The benefit provided by statute is tuition at a public or private school, selected by the parent, with no suggestion that the "private school" must somehow provide a "public" education. Moreover, the differences between private schools eligible to receive tuition assistance under Maine's program and a Maine public school are numerous and important. To start with, private schools do not have to accept all students, while public schools generally do. In addition, the free public education that Maine insists it is providing through the tuition assistance program is often not free, as some participating private schools charge several times the maximum benefit that Maine is willing to provide. And the curriculum taught at participating private schools need not even resemble that taught in the Maine public schools.

The key manner in which participating private schools *are* required to resemble Maine public schools, however, is that they must be secular. Maine may provide a strictly secular education in its public schools. But BCS and Temple Academy—like numerous other recipients of Maine tuition assistance payments—are not public schools. Maine has chosen to offer tuition assistance that parents may direct to the public or private schools of *their* choice. Maine's administration of that benefit is subject to the free exercise principles governing any public benefit program—including the prohibition on denying the benefit based on a recipient's religious exercise. Pp. 11–15.

(2) The Court of Appeals also attempted to distinguish this case from *Trinity Lutheran* and *Espinoza* on the ground that the funding restrictions in those cases were "solely status-based religious discrimination," while the challenged provision here "imposes a use-based restriction." 979 F. 3d, at 35, 37–38. *Trinity Lutheran* and *Espinoza* held that the Free Exercise Clause forbids discrimination on the basis of religious status. But those decisions never suggested that use-based

discrimination is any less offensive to the Free Exercise Clause.  This case illustrates why.  "[E]ducating young people in their faith, inculcating its teachings, and training them to live their faith are responsibilities that lie at the very core of the mission of a private religious school."  *Our Lady of Guadalupe School* v. *Morrissey-Berru*, 591 U. S. ___, ___.  In short, the prohibition on status-based discrimination under the Free Exercise Clause is not a permission to engage in use-based discrimination.

   *Locke* v. *Davey*, 540 U. S. 712, does not assist Maine here.  The scholarship funds at issue in *Locke* were intended to be used "to prepare for the ministry."  *Trinity Lutheran*, 582 U. S., at ___.  *Locke*'s reasoning expressly turned on what it identified as the "historic and substantial state interest" against using "taxpayer funds to support church leaders."  540 U. S., at 722, 725.  But "it is clear that there is no 'historic and substantial' tradition against aiding [private religious] schools" that is "comparable."  *Espinoza*, 591 U. S., at ___.  *Locke* cannot be read to generally authorize the State to exclude religious persons from the enjoyment of public benefits on the basis of their anticipated religious use of the benefits.  Pp. 15–18.

979 F. 3d 21, reversed and remanded.

   ROBERTS, C. J., delivered the opinion of the Court, in which THOMAS, ALITO, GORSUCH, KAVANAUGH, and BARRETT, JJ., joined.  BREYER, J., filed a dissenting opinion, in which KAGAN J., joined, and in which SOTOMAYOR, J., joined as to all but Part I–B.  SOTOMAYOR, J., filed a dissenting opinion.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 20–1088

DAVID CARSON, AS PARENT AND NEXT FRIEND OF O. C., ET AL., PETITIONERS *v.* A. PENDER MAKIN

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

[June 21, 2022]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

Maine has enacted a program of tuition assistance for parents who live in school districts that do not operate a secondary school of their own. Under the program, parents designate the secondary school they would like their child to attend—public or private—and the school district transmits payments to that school to help defray the costs of tuition. Most private schools are eligible to receive the payments, so long as they are "nonsectarian." The question presented is whether this restriction violates the Free Exercise Clause of the First Amendment.

## I

### A

Maine's Constitution provides that the State's legislature shall "require . . . the several towns to make suitable provision, at their own expense, for the support and maintenance of public schools." Me. Const., Art. VIII, pt. 1, §1. In accordance with that command, the legislature has required that every school-age child in Maine "shall be provided an

opportunity to receive the benefits of a free public educa-
tion," Me. Rev. Stat. Ann., Tit. 20–A, §2(1) (2008), and that
the required schools be operated by "the legislative and gov-
erning bodies of local school administrative units," §2(2).
But Maine is the most rural State in the Union, and for
many school districts the realities of remote geography and
low population density make those commands difficult to
heed. Indeed, of Maine's 260 school administrative units
(SAUs), fewer than half operate a public secondary school
of their own. App. 4, 70, 73.

Maine has sought to deal with this problem in part by
creating a program of tuition assistance for families that
reside in such areas. Under that program, if an SAU nei-
ther operates its own public secondary school nor contracts
with a particular public or private school for the education
of its school-age children, the SAU must "pay the tuition . . .
at the public school or the approved private school of the
parent's choice at which the student is accepted." Me. Rev.
Stat. Ann., Tit. 20–A, §5204(4) (Cum. Supp. 2021). Parents
who wish to take advantage of this benefit first select the
school they wish their child to attend. *Ibid.* If they select a
private school that has been "approved" by the Maine De-
partment of Education, the parents' SAU "shall pay the tu-
ition" at the chosen school up to a specified maximum rate.
See §§2902, 2951, 5204(4).

To be "approved" to receive these payments, a private
school must meet certain basic requirements under Maine's
compulsory education law. §2951(1). The school must ei-
ther be "[c]urrently accredited by a New England associa-
tion of schools and colleges" or separately "approv[ed] for
attendance purposes" by the Department. §§2901(2), 2902.
Schools seeking approval from the Department must meet
specified curricular requirements, such as using English as
the language of instruction, offering a course in "Maine his-
tory, including the Constitution of Maine . . . and Maine's
cultural and ethnic heritage," and maintaining a student-

teacher ratio of not more than 30 to 1. §§2902(2), 2902(3), 4706(2), 2902(6)(C).

The program imposes no geographic limitation: Parents may direct tuition payments to schools inside or outside the State, or even in foreign countries. §§2951(3), 5808. In schools that qualify for the program because they are accredited, teachers need not be certified by the State, §13003(3), and Maine's curricular requirements do not apply, §2901(2). Single-sex schools are eligible. See Me. Rev. Stat. Ann., Tit. 5, §4553(2–A) (exempting single-sex private, but not public, schools from Maine's antidiscrimination law).

Prior to 1981, parents could also direct the tuition assistance payments to religious schools. Indeed, in the 1979–1980 school year, over 200 Maine students opted to attend such schools through the tuition assistance program. App. 72. In 1981, however, Maine imposed a new requirement that any school receiving tuition assistance payments must be "a nonsectarian school in accordance with the First Amendment of the United States Constitution." Me. Rev. Stat. Ann., Tit. 20–A, §2951(2). That provision was enacted in response to an opinion by the Maine attorney general taking the position that public funding of private religious schools violated the Establishment Clause of the First Amendment. We subsequently held, however, that a benefit program under which private citizens "direct government aid to religious schools wholly as a result of their own genuine and independent private choice" does not offend the Establishment Clause. *Zelman* v. *Simmons-Harris*, 536 U. S. 639, 652 (2002). Following our decision in *Zelman*, the Maine Legislature considered a proposed bill to repeal the "nonsectarian" requirement, but rejected it. App. 100, 108.

The "nonsectarian" requirement for participation in Maine's tuition assistance program remains in effect today.

The Department has stated that, in administering this requirement, it "considers a sectarian school to be one that is associated with a particular faith or belief system and which, in addition to teaching academic subjects, promotes the faith or belief system with which it is associated and/or presents the material taught through the lens of this faith." 979 F. 3d 21, 38 (CA1 2020). "The Department's focus is on what the school teaches through its curriculum and related activities, and how the material is presented." *Ibid.* (emphasis deleted). "[A]ffiliation or association with a church or religious institution is one potential indicator of a sectarian school," but "it is not dispositive." *Ibid.*

B

This case concerns two families that live in SAUs that neither maintain their own secondary schools nor contract with any nearby secondary school. App. 70, 71. Petitioners David and Amy Carson reside in Glenburn, Maine. *Id.*, at 74. When this litigation commenced, the Carsons' daughter attended high school at Bangor Christian Schools (BCS), which was founded in 1970 as a ministry of Bangor Baptist Church. *Id.*, at 74, 80. The Carsons sent their daughter to BCS because of the school's high academic standards and because the school's Christian worldview aligns with their sincerely held religious beliefs. *Id.*, at 74. Given that BCS is a "sectarian" school that cannot qualify for tuition assistance payments under Maine's program, *id.*, at 80, the Carsons paid the tuition for their daughter to attend BCS themselves, *id.*, at 74.

Petitioners Troy and Angela Nelson live in Palermo, Maine. *Id.*, at 78. When this litigation commenced, the Nelsons' daughter attended high school at Erskine Academy, a secular private school, and their son attended middle school at Temple Academy, a "sectarian" school affiliated with Centerpoint Community Church. *Id.*, at 78, 90, 91. The Nelsons sent their son to Temple Academy because

they believed it offered him a high-quality education that aligned with their sincerely held religious beliefs. *Id.*, at 78. While they wished to send their daughter to Temple Academy too, they could not afford to pay the cost of the Academy's tuition for both of their children. *Id.*, at 79.

BCS and Temple Academy are both accredited by the New England Association of Schools and Colleges (NEASC), and the Department considers each school a "private school approved for attendance purposes" under the State's compulsory attendance requirement. *Id.*, at 80, 90. Yet because neither school qualifies as "nonsectarian," neither is eligible to receive tuition payments under Maine's tuition assistance program. *Id.*, at 80, 90. Absent the "nonsectarian" requirement, the Carsons and the Nelsons would have asked their respective SAUs to pay the tuition to send their children to BCS and Temple Academy, respectively. *Id.*, at 79.

In 2018, petitioners brought suit against the commissioner of the Maine Department of Education. *Id.*, at 11–12. They alleged that the "nonsectarian" requirement of Maine's tuition assistance program violated the Free Exercise Clause and the Establishment Clause of the First Amendment, *id.*, at 23–27, as well as the Equal Protection Clause of the Fourteenth Amendment, *id.*, at 29–30. Their complaint sought declaratory and injunctive relief against enforcement of the requirement. *Id.*, at 31–32. The parties filed cross-motions for summary judgment on a stipulated record. 401 F. Supp. 3d 207, 208 (Me. 2019). Applying Circuit precedent that had previously upheld the "nonsectarian" requirement against challenge, see *Eulitt* v. *Maine Dept. of Ed.*, 386 F. 3d 344 (CA1 2004), the District Court rejected petitioners' constitutional claims and granted judgment to the commissioner. 401 F. Supp. 3d, at 209–212.

While petitioners' appeal to the First Circuit was pending, this Court decided *Espinoza* v. *Montana Department of*

*Revenue*, 591 U. S. ___ (2020). *Espinoza* held that a provision of the Montana Constitution barring government aid to any school "controlled in whole or in part by any church, sect, or denomination," Art. X, §6(1), violated the Free Exercise Clause by prohibiting families from using otherwise available scholarship funds at the religious schools of their choosing. The First Circuit recognized that, in light of *Espinoza*, its prior precedent upholding Maine's "nonsectarian" requirement was no longer controlling. 979 F. 3d, at 32–36. But it nevertheless affirmed the District Court's grant of judgment to the commissioner. *Id.,* at 49.

As relevant here, the First Circuit offered two grounds to distinguish Maine's "nonsectarian" requirement from the no-aid provision at issue in *Espinoza*. First, the panel reasoned that, whereas Montana had barred schools from receiving funding "simply based on their religious identity— a status that in and of itself does not determine how a school would use the funds"—Maine bars BCS and Temple Academy from receiving funding "based on the religious use that they would make of it in instructing children." 979 F. 3d*,* at 40. Second, the panel determined that Maine's tuition assistance program was distinct from the scholarships at issue in *Espinoza* because Maine had sought to provide "a rough equivalent of the public school education that Maine may permissibly require to be secular but that is not otherwise accessible." 979 F. 3d*,* at 44. Thus, "the nature of the restriction at issue and the nature of the school aid program of which it is a key part" led the panel to conclude "once again" that Maine's "nonsectarian" requirement did not violate the Free Exercise Clause. *Id.,* at 46.

We granted certiorari. 594 U. S. ___ (2021).

## II

### A

The Free Exercise Clause of the First Amendment pro-

tects against "indirect coercion or penalties on the free exercise of religion, not just outright prohibitions." *Lyng* v. *Northwest Indian Cemetery Protective Assn.*, 485 U. S. 439, 450 (1988). In particular, we have repeatedly held that a State violates the Free Exercise Clause when it excludes religious observers from otherwise available public benefits. See *Sherbert* v. *Verner*, 374 U. S. 398, 404 (1963) ("It is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege."); see also *Everson* v. *Board of Ed. of Ewing*, 330 U. S. 1, 16 (1947) (a State "cannot exclude" individuals *because of their faith, or lack of it*, from receiving the benefits of public welfare legislation"). A State may not withhold unemployment benefits, for instance, on the ground that an individual lost his job for refusing to abandon the dictates of his faith. See *Sherbert*, 374 U. S., at 399–402 (Seventh-day Adventist who refused to work on the Sabbath); *Thomas* v. *Review Bd. of Ind. Employment Security Div.*, 450 U. S. 707, 709, 720 (1981) (Jehovah's Witness who refused to participate in the production of armaments).

We have recently applied these principles in the context of two state efforts to withhold otherwise available public benefits from religious organizations. In *Trinity Lutheran Church of Columbia, Inc.* v. *Comer*, 582 U. S. \_\_\_ (2017), we considered a Missouri program that offered grants to qualifying nonprofit organizations that installed cushioning playground surfaces made from recycled rubber tires. The Missouri Department of Natural Resources maintained an express policy of denying such grants to any applicant owned or controlled by a church, sect, or other religious entity. The Trinity Lutheran Church Child Learning Center applied for a grant to resurface its gravel playground, but the Department denied funding on the ground that the Center was operated by the Church.

We deemed it "unremarkable in light of our prior decisions" to conclude that the Free Exercise Clause did not permit Missouri to "expressly discriminate[] against otherwise eligible recipients by disqualifying them from a public benefit solely because of their religious character." *Id.*, at ___–___ (slip op., at 9–10). While it was true that Trinity Lutheran remained "free to continue operating as a church," it could enjoy that freedom only "at the cost of automatic and absolute exclusion from the benefits of a public program for which the Center [was] otherwise fully qualified." *Id.,* at ___ (slip op., at 10) (citing *McDaniel* v. *Paty*, 435 U. S. 618, 626 (1978) (plurality opinion)). Such discrimination, we said, was "odious to our Constitution" and could not stand. 582 U. S*.,* at ___ (slip op., at 15).

Two Terms ago, in *Espinoza*, we reached the same conclusion as to a Montana program that provided tax credits to donors who sponsored scholarships for private school tuition. The Montana Supreme Court held that the program, to the extent it included religious schools, violated a provision of the Montana Constitution that barred government aid to any school controlled in whole or in part by a church, sect, or denomination. As a result of that holding, the State terminated the scholarship program, preventing the petitioners from accessing scholarship funds they otherwise would have used to fund their children's educations at religious schools.

We again held that the Free Exercise Clause forbade the State's action. The application of the Montana Constitution's no-aid provision, we explained, required strict scrutiny because it "bar[red] religious schools from public benefits solely because of the religious character of the schools." *Espinoza*, 591 U. S., at ___ (slip op., at 9). "A State need not subsidize private education," we concluded, "[b]ut once a State decides to do so, it cannot disqualify some private schools solely because they are religious." *Id.,* at ___ (slip op., at 20).

## B

The "unremarkable" principles applied in *Trinity Lutheran* and *Espinoza* suffice to resolve this case. Maine offers its citizens a benefit: tuition assistance payments for any family whose school district does not provide a public secondary school. Just like the wide range of nonprofit organizations eligible to receive playground resurfacing grants in *Trinity Lutheran*, a wide range of private schools are eligible to receive Maine tuition assistance payments here. And like the daycare center in *Trinity Lutheran*, BCS and Temple Academy are disqualified from this generally available benefit "solely because of their religious character." 582 U. S., at \_\_\_ (slip op., at 10). By "condition[ing] the availability of benefits" in that manner, Maine's tuition assistance program—like the program in *Trinity Lutheran*—"effectively penalizes the free exercise" of religion. *Ibid.* (quoting *McDaniel*, 435 U. S., at 626 (plurality opinion)).

Our recent decision in *Espinoza* applied these basic principles in the context of religious education that we consider today. There, as here, we considered a state benefit program under which public funds flowed to support tuition payments at private schools. And there, as here, that program specifically carved out private religious schools from those eligible to receive such funds. While the wording of the Montana and Maine provisions is different, their effect is the same: to "disqualify some private schools" from funding "solely because they are religious." 591 U. S., at \_\_\_ (slip op., at 20). A law that operates in that manner, we held in *Espinoza*, must be subjected to "the strictest scrutiny." *Id.*, at \_\_\_–\_\_\_ (slip op., at 11–12).

To satisfy strict scrutiny, government action "must advance 'interests of the highest order' and must be narrowly tailored in pursuit of those interests." *Church of Lukumi Babalu Aye, Inc.* v. *Hialeah*, 508 U. S. 520, 546 (1993) (quoting *McDaniel*, 435 U. S., at 628 (plurality opinion)). "A law

that targets religious conduct for distinctive treatment . . . will survive strict scrutiny only in rare cases." 508 U. S., at 546.

This is not one of them. As noted, a neutral benefit program in which public funds flow to religious organizations through the independent choices of private benefit recipients does not offend the Establishment Clause. See *Zelman*, 536 U. S., at 652–653. Maine's decision to continue excluding religious schools from its tuition assistance program after *Zelman* thus promotes stricter separation of church and state than the Federal Constitution requires. See also *post,* at 4 (BREYER, J., dissenting) (States may choose "not to fund certain religious activity . . . even when the Establishment Clause does not itself prohibit the State from funding that activity"); *post,* at 1 (SOTOMAYOR, J., dissenting) (same point).

But as we explained in both *Trinity Lutheran* and *Espinoza*, such an "interest in separating church and state 'more fiercely' than the Federal Constitution . . . 'cannot qualify as compelling' in the face of the infringement of free exercise." *Espinoza*, 591 U. S., at ___ (slip op., at 18) (quoting *Trinity Lutheran*, 582 U. S., at ___ (slip op., at 14)); see also *Widmar* v. *Vincent*, 454 U. S. 263, 276 (1981) ("[T]he state interest . . . in achieving greater separation of church and State than is already ensured under the Establishment Clause . . . is limited by the Free Exercise Clause."). JUSTICE BREYER stresses the importance of "government neutrality" when it comes to religious matters, *post*, at 13, but there is nothing neutral about Maine's program. The State pays tuition for certain students at private schools— so long as the schools are not religious. That is discrimination against religion. A State's antiestablishment interest does not justify enactments that exclude some members of

the community from an otherwise generally available public benefit because of their religious exercise.*

## III

The First Circuit attempted to distinguish our precedent by recharacterizing the nature of Maine's tuition assistance program in two ways, both of which Maine echoes before this Court. First, the panel defined the benefit at issue as the "rough equivalent of [a Maine] public school education," an education that cannot include sectarian instruction. 979 F. 3d, at 44; see also Brief for Respondent 22. Second, the panel defined the nature of the exclusion as one based not on a school's religious "status," as in *Trinity Lutheran* and *Espinoza*, but on religious "uses" of public funds. 979 F. 3d, at 38–40; see also Brief for Respondent 35. Neither of these formal distinctions suffices to distinguish this case from *Trinity Lutheran* or *Espinoza*, or to affect the application of the free exercise principles outlined above.

### A

The First Circuit held that the "nonsectarian" requirement was constitutional because the benefit was properly viewed not as tuition assistance payments to be used at approved private schools, but instead as funding for the "rough equivalent of the public school education that Maine may permissibly require to be secular." 979 F. 3d, at 44. As Maine puts it, "[t]he public benefit Maine is offering is a free public education." Brief for Respondent 1–2.

To start with, the statute does not say anything like that. It says that an SAU without a secondary school of its own

_____

*Both dissents articulate a number of other reasons not to extend the tuition assistance program to BCS and Temple Academy, based on the schools' particular policies and practices. *Post,* at 15–16 (opinion of BREYER, J.); *post,* at 4 (opinion of SOTOMAYOR, J.). Maine rightly does not attempt to defend its law on such grounds, however, because the law rigidly excludes any and all sectarian schools regardless of particular characteristics. See *supra,* at 3.

"shall pay the tuition . . . at the public school or the approved private school of the parent's choice at which the student is accepted." Me. Rev. Stat. Ann., Tit. 20–A, §5204(4). The benefit is *tuition* at a public *or* private school, selected by the parent, with no suggestion that the "private school" must somehow provide a "public" education.

This reading of the statute is confirmed by the program's operation. The differences between private schools eligible to receive tuition assistance under Maine's program and a Maine public school are numerous and important. To start with the most obvious, private schools are different by definition because they do not have to accept all students. Public schools generally do. Second, the free public education that Maine insists it is providing through the tuition assistance program is often *not* free. That "assistance" is available at private schools that charge several times the maximum benefit that Maine is willing to provide. See Stipulated Record, Exh. 2, in No. 1:18–cv–327 (Me., Mar. 12, 2019), ECF Doc. 24–2, p. 11; Brief for Respondent 32.

Moreover, the curriculum taught at participating private schools need not even resemble that taught in the Maine public schools. For example, Maine public schools must abide by certain "parameters for essential instruction in English language arts; mathematics; science and technology; social studies; career and education development; visual and performing arts; health, physical education and wellness; and world languages." §6209. But NEASC-accredited private schools are exempt from these requirements, and instead subject only to general "standards and indicators" governing the implementation of their own chosen curriculum. Brief for Respondent 32; see NEASC, Standards—20/20 Process (rev. Aug. 2021), https://cis. neasc.org/standards2020 (requiring, for instance, that "[c]urriculum planning supports the school's core beliefs and the needs of the students," and that the "[w]ritten curriculum aligns horizontally and vertically").

Private schools approved by the Department (rather than accredited by NEASC) are likewise exempt from many of the State's curricular requirements, so long as fewer than 60% of their students receive tuition assistance from the State. For instance, such schools need not abide by Maine's "comprehensive, statewide system of learning results," including the "parameters for essential instruction" referenced above, and they need not administer the annual state assessments in English language arts, mathematics, and science. §§2951(6), 6209; see also ECF Doc. 24–2, at 9.

There are other distinctions, too. Participating schools need not hire state-certified teachers. Compare Me. Rev. Stat. Ann., Tit. 20–A, §13003(1), with §13003(3). And the schools can be single-sex. See ECF Doc. 24–2, at 11. In short, it is simply not the case that these schools, to be eligible for state funds, must offer an education that is equivalent—roughly or otherwise—to that available in the Maine public schools.

But the key manner in which the two educational experiences *are* required to be "equivalent" is that they must both be secular. Saying that Maine offers a benefit limited to private secular education is just another way of saying that Maine does not extend tuition assistance payments to parents who choose to educate their children at religious schools. But "the definition of a particular program can always be manipulated to subsume the challenged condition," and to allow States to "recast a condition on funding" in this manner would be to see "the First Amendment . . . reduced to a simple semantic exercise." *Agency for Int'l Development* v. *Alliance for Open Society Int'l, Inc.*, 570 U. S. 205, 215 (2013) (quoting *Legal Services Corporation* v. *Velazquez*, 531 U. S. 533, 547 (2001)); see also *Walz* v. *Tax Comm'n of City of New York*, 397 U. S. 664, 696 (1970) (Harlan, J., concurring) ("The Court must survey meticulously the circumstances of governmental categories to eliminate, as it were, religious gerrymanders."). Maine's formulation does not

answer the question in this case; it simply restates it.

Indeed, were we to accept Maine's argument, our decision in *Espinoza* would be rendered essentially meaningless. By Maine's logic, Montana could have obtained the same result that we held violated the First Amendment simply by rede-fining its tax credit for sponsors of generally available schol-arships as limited to "tuition payments for the rough equiv-alent of a Montana public education"—meaning a secular education. But our holding in *Espinoza* turned on the sub-stance of free exercise protections, not on the presence or absence of magic words. That holding applies fully whether the prohibited discrimination is in an express provision like §2951(2) or in a party's reconceptualization of the public benefit.

Maine may provide a strictly secular education in its pub-lic schools. But BCS and Temple Academy—like numerous other recipients of Maine tuition assistance payments—are not public schools. In order to provide an education to chil-dren who live in certain parts of its far-flung State, Maine has decided *not* to operate schools of its own, but instead to offer tuition assistance that parents may direct to the public or private schools of *their* choice. Maine's administration of that benefit is subject to the free exercise principles govern-ing any such public benefit program—including the prohi-bition on denying the benefit based on a recipient's religious exercise.

The dissents are wrong to say that under our decision to-day Maine "*must*" fund religious education. *Post,* at 7 (BREYER, J., dissenting). Maine chose to allow some par-ents to direct state tuition payments to private schools; that decision was not "forced upon" it. *Post,* at 4 (SOTOMAYOR, J., dissenting). The State retains a number of options: it could expand the reach of its public school system, increase the availability of transportation, provide some combina-tion of tutoring, remote learning, and partial attendance, or

even operate boarding schools of its own. As we held in *Espinoza*, a "State need not subsidize private education. But once a State decides to do so, it cannot disqualify some private schools solely because they are religious." 591 U. S., at ___ (slip op., at 20).

B

The Court of Appeals also attempted to distinguish this case from *Trinity Lutheran* and *Espinoza* on the ground that the funding restrictions in those cases were "solely status-based religious discrimination," while the challenged provision here "imposes a use-based restriction." 979 F. 3d, at 35, 37–38. JUSTICE BREYER makes the same argument. *Post,* at 8–9, 13–14 (dissenting opinion).

In *Trinity Lutheran*, the Missouri Constitution banned the use of public funds in aid of "any church, sect or denomination of religion." 582 U. S., at ___–___ (slip op., at 2–3). We noted that the case involved "express discrimination based on religious identity," which was sufficient unto the day in deciding it, and that our opinion did "not address religious uses of funding." *Id.*, at ___, n. 3 (plurality opinion) (slip op., at 14, n. 3).

So too in *Espinoza*, the discrimination at issue was described by the Montana Supreme Court as a prohibition on aiding "schools controlled by churches," and we analyzed the issue in terms of "religious status and not religious use." 591 U. S., at ___ (slip op., at 10). Foreshadowing Maine's argument here, Montana argued that its case was different from Trinity Lutheran's because it involved not playground resurfacing, but general funds that "could be used for religious ends by some recipients, particularly schools that believe faith should '*permeate*[]' everything they do." *Id.,* at ___ (slip op., at 11). We explained, however, that the strict scrutiny triggered by status-based discrimination could not be avoided by arguing that "one of its goals or effects [was]

preventing religious organizations from putting aid to religious *uses.*" *Ibid.* (emphasis added). And we noted that nothing in our analysis was "meant to suggest that we agree[d] with [Montana] that some lesser degree of scrutiny applies to discrimination against religious uses of government aid." *Id.,* at ___ (slip op., at 12).

Maine's argument, however—along with the decision below and JUSTICE BREYER's dissent—is premised on precisely such a distinction. See Brief for Respondent 44 ("Maine has not broadly excluded private schools simply because they are affiliated with or controlled by a religious organization. Rather, a school is excluded only if it promotes a particular faith and presents academic material through the lens of that faith."); 979 F. 3d, at 40 (Maine provision "does not bar schools from receiving funding simply based on their religious identity" but instead "based on the religious use that they would make of it in instructing children."); *post*, at 9 (BREYER, J., dissenting) ("[U]nlike the circumstances present in *Trinity Lutheran* and *Espinoza*, it is religious activity, not religious labels, that lies at the heart of this case.").

That premise, however, misreads our precedents. In *Trinity Lutheran* and *Espinoza*, we held that the Free Exercise Clause forbids discrimination on the basis of religious status. But those decisions never suggested that use-based discrimination is any less offensive to the Free Exercise Clause. This case illustrates why. "[E]ducating young people in their faith, inculcating its teachings, and training them to live their faith are responsibilities that lie at the very core of the mission of a private religious school." *Our Lady of Guadalupe School* v. *Morrissey-Berru*, 591 U. S. ___, ___ (2020) (slip op., at 18); see also *Hosanna-Tabor Evangelical Lutheran Church and School* v. *EEOC*, 565 U. S. 171, 192 (2012).

Any attempt to give effect to such a distinction by scruti-

nizing whether and how a religious school pursues its educational mission would also raise serious concerns about state entanglement with religion and denominational favoritism. See *Our Lady*, 591 U. S., at \_\_\_ (slip op., at 26); *Larson* v. *Valente*, 456 U. S. 228, 244 (1982). Indeed, Maine concedes that the Department barely engages in any such scrutiny when enforcing the "nonsectarian" requirement. See Brief for Respondent 5 (asserting that there will be no need to probe private schools' uses of tuition assistance funds because "schools self-identify as nonsectarian" under the program and the need for any further questioning is "extremely rare"). That suggests that any status-use distinction lacks a meaningful application not only in theory, but in practice as well. In short, the prohibition on status-based discrimination under the Free Exercise Clause is not a permission to engage in use-based discrimination.

Maine and the dissents invoke *Locke* v. *Davey*, 540 U. S. 712 (2004), in support of the argument that the State may preclude parents from designating a religious school to receive tuition assistance payments. In that case, Washington had established a scholarship fund to assist academically gifted students with postsecondary education expenses. But the program excluded one particular use of the scholarship funds: the "essentially religious endeavor" of pursuing a degree designed to "train[] a minister to lead a congregation." *Id.,* at 721; *Espinoza*, 591 U. S., at \_\_\_ (slip op., at 13). We upheld that restriction against a free exercise challenge, reasoning that the State had "merely chosen not to fund a distinct category of instruction." *Locke,* 540 U. S., at 721.

Our opinions in *Trinity Lutheran* and *Espinoza*, however, have already explained why *Locke* can be of no help to Maine here. Both precedents emphasized, as did *Locke* itself, that the funding in *Locke* was intended to be used "to prepare for the ministry." *Trinity Lutheran*, 582 U. S., at \_\_\_ (slip op., at 12); see also *Espinoza*, 591 U. S., at \_\_\_ (slip

op., at 13); *Locke*, 540 U. S., at 725. Funds could be and were used for theology courses; only pursuing a "vocational religious" *degree* was excluded. *Ibid.*; see also *Trinity Lutheran*, 582 U. S., at \_\_\_–\_\_\_ (slip op., at 12–13) (explaining narrow reach of *Locke*); *Espinoza*, 591 U. S., at \_\_\_–\_\_\_ (slip op., at 13–14) (same).

*Locke*'s reasoning expressly turned on what it identified as the "historic and substantial state interest" against using "taxpayer funds to support church leaders." 540 U. S., at 722, 725. But as we explained at length in *Espinoza*, "it is clear that there is no 'historic and substantial' tradition against aiding [private religious] schools comparable to the tradition against state-supported clergy invoked by *Locke*." 591 U. S., at \_\_\_ (slip op., at 16). *Locke* cannot be read beyond its narrow focus on vocational religious degrees to generally authorize the State to exclude religious persons from the enjoyment of public benefits on the basis of their anticipated religious use of the benefits.

\* \* \*

Maine's "nonsectarian" requirement for its otherwise generally available tuition assistance payments violates the Free Exercise Clause of the First Amendment. Regardless of how the benefit and restriction are described, the program operates to identify and exclude otherwise eligible schools on the basis of their religious exercise. The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 20–1088

_____

DAVID CARSON, AS PARENT AND NEXT FRIEND OF O. C.,
ET AL., PETITIONERS *v.* A. PENDER MAKIN

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIRST CIRCUIT

[June 21, 2022]

JUSTICE BREYER, with whom JUSTICE KAGAN joins, and
with whom JUSTICE SOTOMAYOR joins except as to Part I–
B, dissenting.

The First Amendment begins by forbidding the govern-
ment from "mak[ing] [any] law respecting an establishment
of religion." It next forbids them to make any law "prohib-
iting the free exercise thereof." The Court today pays al-
most no attention to the words in the first Clause while giv-
ing almost exclusive attention to the words in the second.
The majority also fails to recognize the "'play in the joints'"
between the two Clauses. See *Trinity Lutheran Church of
Columbia, Inc.* v. *Comer*, 582 U. S. \_\_\_, \_\_\_ (2017) (slip op.,
at 6). That "play" gives States some degree of legislative
leeway. It sometimes allows a State to further antiestab-
lishment interests by withholding aid from religious insti-
tutions without violating the Constitution's protections for
the free exercise of religion. In my view, Maine's nonsec-
tarian requirement falls squarely within the scope of that
constitutional leeway. I respectfully dissent.

## I
### A

The First Amendment's two Religion Clauses together
provide that the government "shall make no law respecting
an establishment of religion, or prohibiting the free exercise

thereof." Each Clause, linguistically speaking, is "cast in absolute terms." *Walz* v. *Tax Comm'n of City of New York*, 397 U. S. 664, 668 (1970). The first Clause, the Establishment Clause, seems to bar all government "sponsorship, financial support, [or] active involvement . . . in religious activity," while the second Clause, the Free Exercise Clause, seems to bar all "governmental restraint on religious practice." *Id.*, at 668, 670. The apparently absolutist nature of these two prohibitions means that either Clause, "if expanded to a logical extreme, would tend to clash with the other." *Id.*, at 668–669. Because of this, we have said, the two Clauses "are frequently in tension," *Locke* v. *Davey*, 540 U. S. 712, 718 (2004), and "often exert conflicting pressures" on government action, *Cutter* v. *Wilkinson*, 544 U. S. 709, 719 (2005).

On the one hand, the Free Exercise Clause "'protect[s] religious observers against unequal treatment.'" *Trinity Lutheran*, 582 U. S., at ___ (slip op., at 6) (quoting *Church of Lukumi Babalu Aye, Inc.* v. *Hialeah*, 508 U. S. 520, 542 (1993); alteration in original). We have said that, in the education context, this means that States generally cannot "ba[r] religious schools from public benefits solely because of the religious character of the schools." *Espinoza* v. *Montana Dept. of Revenue*, 591 U. S. ___, ___ (2020) (slip op., at 9); see *Trinity Lutheran*, 582 U. S., at ___–___ (slip op., at 9–10).

On the other hand, the Establishment Clause "commands a separation of church and state." *Cutter*, 544 U. S., at 719. A State cannot act to "aid one religion, aid all religions, or prefer one religion over another." *Everson* v. *Board of Ed. of Ewing*, 330 U. S. 1, 15 (1947). This means that a State cannot use "its public school system to aid any or all religious faiths or sects in the dissemination of their doctrines and ideals." *Illinois ex rel. McCollum* v. *Board of Ed. of School Dist. No. 71, Champaign Cty.*, 333 U. S. 203, 211 (1948). Nor may a State "adopt programs or practices in its

public schools . . . which 'aid or oppose' any religion." *Epperson* v. *Arkansas*, 393 U. S. 97, 106 (1968). "This prohibition," we have cautioned, "is absolute." *Ibid.* See, *e.g.*, *McCollum*, 333 U. S. 203 (no weekly religious teachings in public schools); *Engel* v. *Vitale*, 370 U. S. 421 (1962) (no prayers in public schools); *School Dist. of Abington Township* v. *Schempp*, 374 U. S. 203 (1963) (no Bible readings in public schools); *Epperson*, 393 U. S. 97 (no religiously tailored curriculum in public schools); *Wallace* v. *Jaffree*, 472 U. S. 38 (1985) (no period of silence for meditation or prayer in public schools); *Lee* v. *Weisman*, 505 U. S. 577 (1992) (no prayers during public school graduations); *Santa Fe Independent School Dist.* v. *Doe*, 530 U. S. 290 (2000) (no prayers during public school football games).

Although the Religion Clauses are, in practice, often in tension, they nonetheless "express complementary values." *Cutter*, 544 U. S., at 719. Together they attempt to chart a "course of constitutional neutrality" with respect to government and religion. *Walz*, 397 U. S., at 669. They were written to help create an American Nation free of the religious conflict that had long plagued European nations with "governmentally established religion[s]." *Engel*, 370 U. S., at 431. Through the Clauses, the Framers sought to avoid the "anguish, hardship and bitter strife" that resulted from the "union of Church and State" in those countries. *Id.*, at 429; see also *Committee for Public Ed. & Religious Liberty* v. *Nyquist*, 413 U. S. 756, 795–796 (1973).

The Religion Clauses thus created a compromise in the form of religious freedom. They aspired to create a "benevolent neutrality"—one which would "permit religious exercise to exist without sponsorship and without interference." *Walz*, 397 U. S., at 669. "[T]he basic purpose of these provisions" was "to insure that no religion be sponsored or favored, none commanded, and none inhibited." *Ibid.* This religious freedom in effect meant that people "were entitled

to worship God in their own way and to teach their children" in that way. C. Radcliffe, The Law & Its Compass 71 (1960). We have historically interpreted the Religion Clauses with these basic principles in mind. See, *e.g.*, *Nyquist*, 413 U. S., at 771–772, 794–796; *Walz*, 397 U. S., at 668–670; *Engel*, 370 U. S., at 429–432.

And in applying these Clauses, we have often said that "there is room for play in the joints" between them. *Walz*, 397 U. S., at 669; see, *e.g.*, *Norwood* v. *Harrison*, 413 U. S. 455, 469 (1973); *Cutter*, 544 U. S., at 719; *Locke*, 540 U. S., at 718–719; *Trinity Lutheran*, 582 U. S., at ___ (slip op., at 6); *Espinoza*, 591 U. S., at ___ (slip op., at 6). This doctrine reflects the fact that it may be difficult to determine in any particular case whether the Free Exercise Clause *requires* a State to fund the activities of a religious institution, or whether the Establishment Clause *prohibits* the State from doing so. Rather than attempting to draw a highly reticulated and complex free-exercise/establishment line that varies based on the specific circumstances of each state-funded program, we have provided general interpretive principles that apply uniformly in all Religion Clause cases. At the same time, we have made clear that States enjoy a degree of freedom to navigate the Clauses' competing prohibitions. See, *e.g.*, *Cutter*, 544 U. S., at 713, 719–720. This includes choosing not to fund certain religious activity where States have strong, establishment-related reasons for not doing so. See, *e.g.*, *Locke*, 540 U. S., at 719–722. And, States have freedom to make this choice even when the Establishment Clause does not itself prohibit the State from funding that activity. *Id.*, at 719 ("[T]here are some state actions permitted by the Establishment Clause but not required by the Free Exercise Clause"). The Court today nowhere mentions, and I fear effectively abandons, this longstanding doctrine.

### B

I have previously discussed my views of the relationship between the Religion Clauses and how I believe these Clauses should be interpreted to advance their goal of avoiding religious strife. See, *e.g.*, *Espinoza*, 591 U. S., at \_\_\_–\_\_\_ (dissenting opinion) (slip op., at 13–20); *Van Orden* v. *Perry*, 545 U. S. 677, 698–705 (2005) (opinion concurring in judgment); *Zelman* v. *Simmons-Harris*, 536 U. S. 639, 717–729 (2002) (dissenting opinion). Here I simply note the increased risk of religiously based social conflict when government promotes religion in its public school system. "[T]he prescription of prayer and Bible reading in the public schools, during and as part of the curricular day, involving young impressionable children whose school attendance is statutorily compelled," can "give rise to those very divisive influences and inhibitions of freedom which both religion clauses of the First Amendment" sought to prevent. *Schempp*, 374 U. S., at 307 (Goldberg, J., concurring).

This potential for religious strife is still with us. We are today a Nation with well over 100 different religious groups, from Free Will Baptist to African Methodist, Buddhist to Humanist. See Pew Research Center, America's Changing Religious Landscape 21 (May 12, 2015). People in our country adhere to a vast array of beliefs, ideals, and philosophies. And with greater religious diversity comes greater risk of religiously based strife, conflict, and social division. The Religion Clauses were written in part to help avoid that disunion. As Thomas Jefferson, one of the leading drafters and proponents of those Clauses, wrote, "'to compel a man to furnish contributions of money for the propagation of opinions which he disbelieves, is sinful and tyrannical.'" *Everson*, 330 U. S., at 13. And as James Madison, another drafter and proponent, said, compelled taxpayer sponsorship of religion "is itself a signal of persecution," which "will destroy that moderation and harmony

which the forbearance of our laws to intermeddle with Re-
ligion, has produced amongst its several sects." *Id.*, at 68–
69 (appendix to dissenting opinion of Rutledge, J.). To in-
terpret the Clauses with these concerns in mind may help
to further their original purpose of avoiding religious-based
division.

I have also previously explained why I believe that a
"rigid, bright-line" approach to the Religion Clauses—an
approach without any leeway or "play in the joints"—will
too often work against the Clauses' underlying purposes.
*Espinoza*, 591 U. S., at ___ (dissenting opinion) (slip op., at
18); see also *Van Orden*, 545 U. S., at 669–700 (opinion con-
curring in judgment). "[G]overnment benefits come in
many shapes and sizes." *Espinoza*, 591 U. S., at ___ (slip
op., at 16) (dissenting opinion). Not all state-funded pro-
grams that have religious restrictions carry the same risk
of creating social division and conflict. In my view, that risk
can best be understood by considering the particular benefit
at issue, along with the reasons for the particular religious
restriction at issue. See *ibid.*; *Trinity Lutheran*, 582 U. S.,
at ___ (slip op., at 1) (BREYER, J., concurring in judgment).
Recognition that States enjoy a degree of constitutional lee-
way allows States to enact laws sensitive to local circum-
stances while also allowing this Court to consider those cir-
cumstances in light of the basic values underlying the
Religion Clauses.

In a word, to interpret the two Clauses as if they were
joined at the hip will work against their basic purpose: to
allow for an American society with practitioners of over 100
different religions, and those who do not practice religion at
all, to live together without serious risk of religion-based
social divisions.

## II

The majority believes that the principles set forth in this
Court's earlier cases easily resolve this case. But they do

not.

We have previously found, as the majority points out, that "a neutral benefit program in which public funds flow to religious organizations through the independent choices of private benefit recipients does not offend the Establishment Clause." *Ante*, at 10 (citing *Zelman*, 536 U. S., at 652–653). We have thus concluded that a State *may*, consistent with the Establishment Clause, provide funding to religious schools through a general public funding program if the "government aid . . . reach[es] religious institutions only by way of the deliberate choices of . . . individual [aid] recipients." *Id.*, at 652.

But the key word is "may." We have never previously held what the Court holds today, namely, that a State *must* (not *may*) use state funds to pay for religious education as part of a tuition program designed to ensure the provision of free statewide public school education.

What happens once "may" becomes "must"? Does that transformation mean that a school district that pays for public schools must pay equivalent funds to parents who wish to send their children to religious schools? Does it mean that school districts that give vouchers for use at charter schools must pay equivalent funds to parents who wish to give their children a religious education? What other social benefits are there the State's provision of which means—under the majority's interpretation of the Free Exercise Clause—that the State must pay parents for the religious equivalent of the secular benefit provided? The concept of "play in the joints" means that courts need not, and should not, answer with "must" these questions that can more appropriately be answered with "may."

The majority also asserts that "[t]he 'unremarkable' principles applied in *Trinity Lutheran* and *Espinoza* suffice to resolve this case." *Ante*, at 9. Not so. The state-funded program at issue in *Trinity Lutheran* provided payment for

resurfacing school playgrounds to make them safer for children. Any Establishment Clause concerns arising from providing money to religious schools for the creation of safer play yards are readily distinguishable from those raised by providing money to religious schools through the program at issue here—a tuition program designed to ensure that all children receive their constitutionally guaranteed right to a free public education. After all, cities and States normally pay for police forces, fire protection, paved streets, municipal transport, and hosts of other services that benefit churches as well as secular organizations. But paying the salary of a religious teacher as part of a public school tuition program is a different matter.

In addition, schools were excluded from the playground resurfacing program at issue in *Trinity Lutheran* because of the mere fact that they were "owned or controlled by a church, sect, or other religious entity." 582 U. S., at ___ (slip op., at 2). Schools were thus disqualified from receiving playground funds "solely because of their religious character," not because of the "religious uses of [the] funding" they would receive. *Id.*, at ___, ___, n. 3 (slip op., at 10, 14, n. 3). Here, by contrast, a school's "'affiliation or association with a church or religious institution . . . is not dispositive'" of its ability to receive tuition funds. 979 F. 3d 21, 38 (CA1 2020) (quoting then-commissioner of Maine's Department of Education). Instead, Maine chooses not to fund only those schools that "'promot[e] the faith or belief system with which [the schools are] associated and/or presen[t] the [academic] material taught through the lens of this faith'"—*i.e.*, schools that will use public money for religious purposes. *Ibid.* Maine thus excludes schools from its tuition program not because of the schools' religious character but because the schools will use the funds to teach and promote religious ideals.

For similar reasons, *Espinoza* does not resolve the present case. In *Espinoza*, Montana created "a scholarship

program for students attending private schools." 591 U. S.,
at \_\_\_ (slip op., at 1). But the State prohibited families from
using the scholarship at any private school "'owned or con-
trolled in whole or in part by any church, religious sect, or
denomination.'" *Id.*, at \_\_\_ (slip op., at 3) (quoting Mont.
Admin. Rule §42.4.802(1)(a) (2015)). As in *Trinity Lu-
theran*, Montana denied funds to schools based "expressly
on religious status and not religious use"; "[t]o be eligible"
for scholarship funds, a school had to "divorce itself from
any religious control or affiliation." 591 U. S. at \_\_\_–\_\_\_
(slip op., at 10–11). Here, again, Maine denies tuition
money to schools not because of their religious affiliation,
but because they will use state funds to promote religious
views.

These distinctions are important. The very point of the
Establishment Clause is to prevent the government from
sponsoring religious activity itself, thereby favoring one re-
ligion over another or favoring religion over nonreligion.
See *Engel*, 370 U. S., at 430 ("Under [the Establishment
Clause] . . . government in this country, be it state or fed-
eral, is without power to prescribe by law . . . any program
of governmentally sponsored religious activity"); *Walz*, 397
U. S., at 668 ("[F]or the men who wrote the Religion Clauses
. . . the 'establishment' of a religion connoted . . . [any] ac-
tive involvement of the sovereign in religious activity");
*Everson*, 330 U. S., at 15 (States may not "pass laws which
aid one religion, aid all religions, or prefer one religion over
another"). State funding of religious activity risks the very
social conflict based upon religion that the Religion Clauses
were designed to prevent. And, unlike the circumstances
present in *Trinity Lutheran* and *Espinoza*, it is religious ac-
tivity, not religious labels, that lies at the heart of this case.

## III
## A

I turn now to consider the Maine program at issue here.

Maine's Constitution guarantees Maine's children a free public education by requiring that all towns provide "for the support and maintenance of public schools." Art. VIII, pt. 1, §1; see also Me. Rev. Stat. Ann., Tit. 20–A, §2(1) (2008). Because of the State's rural geography and dispersed population, however, over half of Maine's school districts do not operate public secondary schools. App. 70. To fulfill its constitutional promise, Maine created a program that provides some parents in these districts with a monetary grant to help them educate their children "at the public school or the approved private school of the parent's choice." Me. Rev. Stat. Ann., Tit. 20–A, §5204(4) (Cum. Supp. 2021). The program's "function is limited to authorizing the provision of tuition subsidies to the parents of children who live within school [districts] that simply do not have the resources to operate a public school system, and whose children would otherwise not be given an opportunity to receive a free public education." *Hallissey* v. *School Administrative Dist. No. 77*, 2000 ME 143, ¶16, 755 A. 2d 1068, 1073.

Under Maine law, an "approved" private school must be "nonsectarian." §2951(2). A school fails to meet that requirement (and is deemed "sectarian") only if it is *both* (1) "'associated with a particular faith or belief system'" *and also* (2) "'promotes the faith or belief system with which it is associated and/or presents the [academic] material taught through the lens of this faith.'" 979 F. 3d, at 38 (quoting Maine's then-education commissioner). To determine whether a school is sectarian, the "'focus is on what the school teaches through its curriculum and related activities, and how the material is presented.'" *Ibid.* (emphasis deleted). "'[A]ffiliation or association with a church or religious institution . . . is not dispositive'" of sectarian status. *Ibid.*

The two private religious schools at issue here satisfy both of these criteria. They are affiliated with a church or religious organization. See App. 80, 91. And they also teach

students to accept particular religious beliefs and to engage in particular religious practices.

The first school, Bangor Christian, has "educational objectives" that include "'lead[ing] each unsaved student to trust Christ as his/her personal savior and then to follow Christ as Lord of his/her life,'" and "'develop[ing] within each student a Christian world view and Christian philosophy of life.'" *Id*., at 84. Bangor Christian "does not believe there is any way to separate the religious instruction from the academic instruction." *Id*., at 85. Academic instruction and religious instruction are thus "completely intertwined." *Ibid.* Bangor Christian teaches in its social studies class, for example, "'that God has ordained evangelism.'" *Id*., at 87. And in science class, students learn that atmospheric layers "'are evidence of God's good design.'" *Id*., at 89.

The second school, Temple Academy, similarly promotes religion through academics. Its "educational philosophy 'is based on a thoroughly Christian and Biblical world view.'" *Id*., at 92. The school's "objectives" include "'foster[ing] within each student an attitude of love and reverence of the Bible as the infallible, inerrant, and authoritative Word of God.'" *Ibid.* And the school's "'academic growth' objectives" include "'provid[ing] a sound academic education in which the subjec[t] areas are taught from a Christian point of view,'" and "'help[ing] every student develop a truly Christian world view by integrating studies with the truths of Scripture.'" *Id*., at 93. Like Bangor Christian, Temple "provides a 'biblically-integrated education,' which means that the Bible is used in every subject that is taught." *Id*., at 96. In mathematics classes, for example, students learn that "a creator designed the universe such that 'one plus one is always going to be two.'" *Ibid.*

The differences between this kind of education and a purely civic, public education are important. "The religious education and formation of students is the very reason for the existence of most private religious schools." *Our Lady*

*of Guadalupe School* v. *Morrissey-Berru*, 591 U. S. ___, ___
(2020) (slip op., at 2). "[E]ducating young people in their
faith, inculcating its teachings, and training them to live
their faith," we have said, "are responsibilities that lie at
the very core of the mission of a private religious school."
*Id.*, at ___ (slip op., at 18). Indeed, we have recognized that
the "connection that religious institutions draw between
their central purpose and educating the young in the faith"
is so "close" that teachers employed at such schools act as
"ministers" for purposes of the First Amendment. *Id.*, at
___, ___ (slip op., at 2, 21); see also *Hosanna-Tabor Evan-*
*gelical Lutheran Church and School* v. *EEOC*, 565 U. S. 171
(2012).

By contrast, public schools, including those in Maine,
seek first and foremost to provide a primarily civic educa-
tion. We have said that, in doing so, they comprise "a most
vital civic institution for the preservation of a democratic
system of government, and . . . the primary vehicle for
transmitting the values on which our society rests." *Plyler*
v. *Doe*, 457 U. S. 202, 221 (1982) (citation and internal quo-
tation marks omitted). To play that role effectively, public
schools are religiously neutral, neither disparaging nor pro-
moting any one particular system of religious beliefs. We
accordingly have, as explained above, consistently required
public school education to be free from religious affiliation
or indoctrination. Cf. *Edwards* v. *Aguillard*, 482 U. S. 578,
583–584 (1987) ("The Court has been particularly vigilant
in monitoring compliance with the Establishment Clause in
elementary and secondary [public] schools").

Maine legislators who endorsed the State's nonsectarian
requirement recognized these differences between public
and religious education. They did not want Maine taxpay-
ers to finance, through a tuition program designed to en-
sure the provision of free public education, schools that
would use state money for teaching religious practices. See,
*e.g.*, App. 104 (Maine representative stating that "[f]rom a

public policy position, we must believe that a religiously neutral classroom is the best if funded by public dollars"); *id.*, at 106 (Maine senator asserting that the State's "limited [tax] dollars for schools" should be spent on those "that are non-religious and that are neutral on religion"). Underlying these views is the belief that the Establishment Clause seeks government neutrality. And the legislators thought that government payment for this kind of religious education would be antithetical to the religiously neutral education that the Establishment Clause requires in public schools. Cf. *Epperson*, 393 U. S., at 106; *McCollum*, 333 U. S., at 211. Maine's nonsectarian requirement, they believed, furthered the State's antiestablishment interests in not promoting religion in its public school system; the requirement prevented public funds—funds allocated to ensure that all children receive their constitutional right to a free public education—from being given to schools that would use the funds to promote religion.

In the majority's view, the fact that private individuals, not Maine itself, choose to spend the State's money on religious education saves Maine's program from Establishment Clause condemnation. But that fact, as I have said, simply *permits* Maine to route funds to religious schools. See, *e.g.*, *Zelman*, 536 U. S., at 652. It does not *require* Maine to spend its money in that way. That is because, as explained above, this Court has long followed a legal doctrine that gives States flexibility to navigate the tension between the two Religion Clauses. *Supra*, at 4. This doctrine "recognize[s] that there is 'play in the joints' between what the Establishment Clause permits and the Free Exercise Clause compels." *Trinity Lutheran*, 582 U. S., at \_\_\_ (slip op., at 6) (quoting *Locke*, 540 U. S., at 718). This wiggle-room means that "[t]he course of constitutional neutrality in this area cannot be an absolutely straight line." *Walz*, 397 U. S., at 669. And in walking this line of government

neutrality, States must have "some space for legislative ac-
tion neither compelled by the Free Exercise Clause nor pro-
hibited by the Establishment Clause," *Cutter*, 544 U. S., at
719, in which they can navigate the tension created by the
Clauses and consider their own interests in light of the
Clauses' competing prohibitions. See, *e.g.*, *Walz*, 397 U. S.,
at 669.

Nothing in our Free Exercise Clause cases *compels* Maine
to give tuition aid to private schools that will use the funds
to provide a religious education. As explained above, this
Court's decisions in *Trinity Lutheran* and *Espinoza* prohibit
States from denying aid to religious schools solely because
of a school's religious *status*—that is, its affiliation with or
control by a religious organization. *Supra*, at 7–9. But we
have never said that the Free Exercise Clause prohibits
States from withholding funds because of the religious *use*
to which the money will be put. Cf. *Trinity Lutheran*, 582
U. S., at ___ (slip op., at 12). To the contrary, we upheld in
*Locke* a State's decision to deny public funding to a recipient
"because of what he proposed *to do*" with the money, when
what he proposed to do was to "use the funds to prepare for
the ministry." *Trinity Lutheran*, 582 U. S., at ___ (slip op.,
at 12); see also *Espinoza*, 591 U. S., at ___ (slip op., at 13)
(characterizing *Locke* similarly). Maine does not refuse to
pay tuition at private schools because of religious status or
affiliation. The State only denies funding to schools that
will use the money to promote religious beliefs through a
religiously integrated education—an education that, in
Maine's view, is not a replacement for a civic-focused public
education. See 979 F. 3d, at 38. This makes Maine's deci-
sion to withhold public funds more akin to the state decision
that we upheld in *Locke*, and unlike the withholdings that
we invalidated in *Trinity Lutheran* and *Espinoza*.

The Free Exercise Clause thus does not require Maine to
fund, through its tuition program, schools that will use pub-

lic money to promote religion. And considering the Establishment Clause concerns underlying the program, Maine's decision not to fund such schools falls squarely within the play in the joints between those two Clauses. Maine has promised all children within the State the right to receive a free public education. In fulfilling this promise, Maine endeavors to provide children the religiously neutral education required in public school systems. And that, in significant part, reflects the State's antiestablishment interests in avoiding spending public money to support what is essentially religious activity. The Religion Clauses give Maine the ability, and flexibility, to make this choice.

### B

In my view, Maine's nonsectarian requirement is also constitutional because it supports, rather than undermines, the Religion Clauses' goal of avoiding religious strife. Forcing Maine to fund schools that provide the sort of religiously integrated education offered by Bangor Christian and Temple Academy creates a similar potential for religious strife as that raised by promoting religion in public schools. It may appear to some that the State favors a particular religion over others, or favors religion over nonreligion. Members of minority religions, with too few adherents to establish schools, may see injustice in the fact that only those belonging to more popular religions can use state money for religious education. Taxpayers may be upset at having to finance the propagation of religious beliefs that they do not share and with which they disagree. And parents in school districts that have a public secondary school may feel indignant that only *some* families in the State—those families in the more rural districts without public schools—have the opportunity to give their children a Maine-funded religious education.

Maine legislators who endorsed the State's nonsectarian requirement understood this potential for social conflict.

They recognized the important rights that religious schools have to create the sort of religiously inspired curriculum that Bangor Christian and Temple Academy teach. Legislators also recognized that these private schools make religiously based enrollment and hiring decisions. Bangor Christian and Temple Academy, for example, have admissions policies that allow them to deny enrollment to students based on gender, gender-identity, sexual orientation, and religion, and both schools require their teachers to be Born Again Christians. App. 82–83, 89, 93, 98. Legislators did not want Maine taxpayers to pay for these religiously based practices—practices not universally endorsed by all citizens of the State—for fear that doing so would cause a significant number of Maine citizens discomfort or displeasure. See, *e.g.*, *id.*, at 101 (Maine representative noting that "private religious schools discriminate against citizens of the State of Maine," such as by "not hir[ing] individuals whose beliefs are not consistent with the school's religious teachings," and asserting that "it is fundamentally wrong for us to fund" such discrimination); *id.*, at 104 (Maine representative stating that "the people of Maine" should not use "public money" to advance "their religious pursuits," and that "discrimination in religious institutions" should not be funded "with my dollar"); *id.*, at 107 (Maine senator expressing concern that "public funds could be used to teach intolerant religious views"). The nonsectarian requirement helped avoid this conflict—the precise kind of social conflict that the Religion Clauses themselves sought to avoid.

Maine's nonsectarian requirement also serves to avoid religious strife between the State and the religious schools. Given that Maine is funding the schools as part of its effort to ensure that all children receive the basic public education to which they are entitled, Maine has an interest in ensuring that the education provided at these schools meets certain curriculum standards. Religious schools, on the other

hand, have an interest in teaching a curriculum that advances the tenets of their religion. And the schools are of course entitled to teach subjects in the way that best reflects their religious beliefs. But the State may disagree with the particular manner in which the schools have decided that these subjects should be taught.

This is a situation ripe for conflict, as it forces Maine into the position of evaluating the adequacy or appropriateness of the schools' religiously inspired curriculum. Maine does not want this role. As one legislator explained, one of the reasons for the nonsectarian requirement was that "[g]overnment officials cannot, and should not, review the religious teachings of religious schools." *Ibid.* Another legislator cautioned that the State would be unable to "reconcile" the curriculum of "private religious schools who teach religion in the classroom" with Maine "standards . . . that do not include any sort of religion in them." *Id.*, at 102.

Nor do the schools want Maine in this role. Bangor Christian asserted that it would only consider accepting public funds if it "did not have to make any changes in how it operates." *Id.*, at 90. Temple Academy similarly stated that it would only accept state money if it had "in writing that the school would not have to alter its admissions standards, hiring standards, or curriculum." *Id.*, at 99. The nonsectarian requirement ensures that Maine is not pitted against private religious schools in these battles over curriculum or operations, thereby avoiding the social strife resulting from this state-versus-religion confrontation. By invalidating the nonsectarian requirement, the majority today subjects the State, the schools, and the people of Maine to social conflict of a kind that they, and the Religion Clauses, sought to prevent.

I emphasize the problems that may arise out of today's decision because they reinforce my belief that the Religion Clauses do not require Maine to pay for a religious education simply because, in some rural areas, the State will help

parents pay for a secular education. After all, the Estab-lishment Clause forbids a State from paying for the practice of religion itself. And state neutrality in respect to the *teaching* of the practice of religion lies at the heart of this Clause. See, *e.g.*, *Locke*, 540 U. S., at 721–722 (noting that there are "few areas in which a State's antiestablishment interests come more into play" than state funding of minis-ters who will "lead [their] congregation[s]" in "religious en-deavor[s]"). There is no meaningful difference between a State's payment of the salary of a religious minister and the salary of someone who will teach the practice of religion to a person's children. At bottom, there is almost no area "as central to religious belief as the shaping, through primary education, of the next generation's minds and spirits." *Zel-man*, 536 U. S., at 725 (BREYER, J., dissenting). The Estab-lishment Clause was intended to keep the State out of this area.

\*    \*    \*

Maine wishes to provide children within the State with a secular, public education. This wish embodies, in signifi-cant part, the constitutional need to avoid spending public money to support what is essentially the teaching and prac-tice of religion. That need is reinforced by the fact that we are today a Nation of more than 330 million people who as-cribe to over 100 different religions. In that context, state neutrality with respect to religion is particularly important. The Religion Clauses give Maine the right to honor that neutrality by choosing not to fund religious schools as part of its public school tuition program. I believe the majority is wrong to hold the contrary. And with respect, I dissent.

# SUPREME COURT OF THE UNITED STATES

_____

No. 20–1088

_____

DAVID CARSON, AS PARENT AND NEXT FRIEND OF O. C., ET AL., PETITIONERS *v.* A. PENDER MAKIN

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

[June 21, 2022]

JUSTICE SOTOMAYOR, dissenting.

This Court continues to dismantle the wall of separation between church and state that the Framers fought to build. JUSTICE BREYER explains why the Court's analysis falters on its own terms, and I join all but Part I–B of his dissent. I write separately to add three points.

First, this Court should not have started down this path five years ago. See *Trinity Lutheran Church of Columbia, Inc.* v. *Comer*, 582 U. S. \_\_\_ (2017). Before *Trinity Lutheran*, it was well established that "both the United States and state constitutions embody distinct views" on "the subject of religion"—"in favor of free exercise, but opposed to establishment"—"that find no counterpart" with respect to other constitutional rights. *Locke* v. *Davey*, 540 U. S. 712, 721 (2004). Because of this tension, the Court recognized "'room for play in the joints' between" the Religion Clauses, with "some state actions permitted by the Establishment Clause but not required by the Free Exercise Clause." *Id.,* at 718–719 (quoting *Walz* v. *Tax Comm'n of City of New York*, 397 U. S. 664, 669 (1970)); see *ante,* at 4 (BREYER, J., dissenting). Using this flexibility, and consistent with a rich historical tradition, see *Trinity Lutheran*, 582 U. S., at \_\_\_–\_\_\_ (SOTOMAYOR, J., dissenting) (slip op., at 11–16), States and the Federal Government could decline to fund

religious institutions. Moreover, the Court for many decades understood the Establishment Clause to prohibit government from funding religious exercise.*

Over time, the Court eroded these principles in certain respects. See, *e.g., Zelman* v. *Simmons-Harris*, 536 U. S. 639, 662 (2002) (allowing government funds to flow to religious schools if private individuals selected the benefiting schools; the government program was "entirely neutral with respect to religion"; and families enjoyed a "genuine choice among options public and private, secular and religious"). Nevertheless, the space between the Clauses continued to afford governments "some room to recognize the unique status of religious entities and to single them out on that basis for exclusion from otherwise generally applicable laws." *Trinity Lutheran*, 582 U. S., at ___ (SOTOMAYOR, J., dissenting) (slip op., at 9).

*Trinity Lutheran* veered sharply away from that understanding. After assuming away an Establishment Clause violation, the Court revolutionized Free Exercise doctrine by equating a State's decision not to fund a religious organization with presumptively unconstitutional discrimination on the basis of religious status. See *id.,* at ___–___ (slip op., at 10–11). A plurality, however, limited the Court's decision to "express discrimination based on religious identity" (*i.e.,* status), not "religious uses of funding." *Id.,* at ___, n. 3 (slip op., at 14, n. 3). In other words, a State was barred

––––––––––

*See, *e.g., Everson* v. *Board of Ed. of Ewing*, 330 U. S. 1, 16 (1947) ("No tax in any amount, large or small, can be levied to support any religious activities or institutions . . . "); *Agostini* v. *Felton*, 521 U. S. 203, 222–223 (1997) (observing that government aid that impermissibly "advanc[ed] . . . religion" was constitutionally barred); *Mitchell* v. *Helms*, 530 U. S. 793, 840 (2000) (O'Connor, J., concurring in judgment) ("[O]ur decisions provide no precedent for the use of public funds to finance religious activities" (internal quotation marks omitted)); see also *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819, 875–876 (1995) (Souter, J., dissenting) (chronicling cases).

from withholding funding from a religious entity "solely be-
cause of its religious character," *id.,* at \_\_\_ (opinion of the
Court) (slip op., at 14), but retained authority to do so on
the basis that the funding would be put to religious uses.
Two Terms ago, the Court reprised and extended *Trinity
Lutheran*'s error to hold that a State could not limit a pri-
vate-school voucher program to secular schools. *Espinoza*
v. *Montana Dept. of Revenue*, 591 U. S. \_\_\_, \_\_\_ (2020) (slip
op., at 9). The Court, however, again refrained from extend-
ing *Trinity Lutheran* from funding restrictions based on re-
ligious status to those based on religious uses. *Espinoza*,
591 U. S., at \_\_\_–\_\_\_ (2020) (slip op., at 9–12).

As JUSTICE BREYER explains, see *ante,* at 8–9, this status-
use distinction readily distinguishes this case from *Trinity
Lutheran* and *Espinoza*. I warned in *Trinity Lutheran*,
however, that the Court's analysis could "be manipulated to
call for a similar fate for lines drawn on the basis of reli-
gious use." 582 U. S., at \_\_\_, n. 14 (dissenting opinion) (slip
op., at 25, n. 14). That fear has come to fruition: The Court
now holds for the first time that "any status-use distinction"
is immaterial in both "theory" and "practice." *Ante,* at 17.
It reaches that conclusion by embracing arguments from
prior separate writings and ignoring decades of precedent
affording governments flexibility in navigating the tension
between the Religion Clauses. As a result, in just a few
years, the Court has upended constitutional doctrine, shift-
ing from a rule that permits States to decline to fund reli-
gious organizations to one that requires States in many cir-
cumstances to subsidize religious indoctrination with
taxpayer dollars.

Second, the consequences of the Court's rapid transfor-
mation of the Religion Clauses must not be understated.
From a doctrinal perspective, the Court's failure to apply
the play-in-the-joints principle here, see *ante,* at 13–14
(BREYER, J., dissenting), leaves one to wonder what, if any-
thing, is left of it. The Court's increasingly expansive view

of the Free Exercise Clause risks swallowing the space be-
tween the Religion Clauses that once "permit[ted] religious
exercise to exist without sponsorship and without interfer-
ence." *Walz*, 397 U. S., at 669.

From a practical perspective, today's decision directs the
State of Maine (and, by extension, its taxpaying citizens) to
subsidize institutions that undisputedly engage in religious
instruction. See *ante,* at 10–11 (BREYER, J., dissenting). In
addition, while purporting to protect against discrimination
of one kind, the Court requires Maine to fund what many of
its citizens believe to be discrimination of other kinds. See
*ante,* at 16 (BREYER, J., dissenting) (summarizing Bangor
Christian Schools' and Temple Academy's policies denying
enrollment to students based on gender identity, sexual ori-
entation, and religion). The upshot is that Maine must
choose between giving subsidies to its residents or refrain-
ing from financing religious teaching and practices.

Finally, the Court's decision is especially perverse be-
cause the benefit at issue is the public education to which
all of Maine's children are entitled under the State Consti-
tution. As this Court has long recognized, the Establish-
ment Clause requires that public education be secular and
neutral as to religion. See *ante,* at 2–3, 12 (BREYER, J., dis-
senting) (collecting cases). The Court avoids this framing
of Maine's benefit because, it says, "Maine has decided *not*
to operate schools of its own, but instead to offer tuition as-
sistance that parents may direct to the public or private
schools of *their* choice." *Ante,* at 14. In fact, any such
"deci[sion]," *ibid.*, was forced upon Maine by "the realities
of remote geography and low population density," *ante,* at
2, which render it impracticable for the State to operate its
own schools in many communities.

The Court's analysis does leave some options open to
Maine. For example, under state law, school administra-
tive units (SAUs) that cannot feasibly operate their own

schools may contract directly with a public school in another SAU, or with an approved private school, to educate their students. See Me. Rev. Stat. Ann., Tit. 20–A, §§2701, 2702 (2008). I do not understand today's decision to mandate that SAUs contract directly with schools that teach religion, which would go beyond *Zelman*'s private-choice doctrine and blatantly violate the Establishment Clause. Nonetheless, it is irrational for this Court to hold that the Free Exercise Clause bars Maine from giving money to parents to fund the only type of education the State may provide consistent with the Establishment Clause: a religiously neutral one. Nothing in the Constitution requires today's result.

\* \* \*

What a difference five years makes. In 2017, I feared that the Court was "lead[ing] us . . . to a place where separation of church and state is a constitutional slogan, not a constitutional commitment." *Trinity Lutheran*, 582 U. S., at \_\_\_ (dissenting opinion) (slip op., at 27). Today, the Court leads us to a place where separation of church and state becomes a constitutional violation. If a State cannot offer subsidies to its citizens without being required to fund religious exercise, any State that values its historic antiestablishment interests more than this Court does will have to curtail the support it offers to its citizens. With growing concern for where this Court will lead us next, I respectfully dissent.